IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| v. | : | |
| | : | No. 22-21 |
| BRIAN JAMES KUNSMAN | | |

MEMORANDUM

SCHMEHL, J.   /s/JLS                                                                    MAY 15, 2023

On January 20, 2022, Defendant was charged by indictment with one count of possession of an unregistered destructive device (a "pipe bomb"), in violation of 18 U.S.C. § 5861(d) and one count of possession of an explosive by a felon, in violation of 18 U.S.C. §§ 842(i)(1),(p), and 844(j).

The incident giving rise to the indictment occurred on Friday, October 15, 2021, when an emergency room nurse attending to Defendant while he was being treated at St. Luke's Hospital (the "Hospital") in the Borough of Fountain Hill in Lehigh County, Pennsylvania, discovered that Defendant had a "pipe bomb" in his backpack. Presently before the Court is the Defendant's motion to suppress physical evidence and post-arrest statements. On March 22, 2023, the Court held an evidentiary hearing on the motion. For the reasons that follow, the motion is denied.

At the hearing, Kristen Reuss testified that she has been working as a nurse in the emergency room/trauma center at the Hospital since 2015. She normally works the 7:00 a.m. to 7:00 p.m. shift on three out of every four weekends. However, on Friday, October 15, 2021, she was working the 7:00 a.m. to 7:00 p.m. shift as a registered nurse. Nurse Reuss testified that Defendant had been admitted to the emergency room

1

of the Hospital the previous evening following a serious car accident. Defendant had been in the emergency room for about seven to eight hours by the time Nurse Reuss had begun her shift. She did not know at the time she began her shift how long Defendant had been waiting to be discharged. She admitted that hospital records showed that Defendant had been ready to be discharged at 4:31 a.m. and that she had clocked in at 6:51 a.m.

At the beginning of her shift, Nurse Reuss had five patients assigned to her, including the Defendant. Nurse Reuss noticed that Defendant was ready to be discharged. Since Defendant lived in Philadelphia, he was not eligible for the Hospital's ride-share program. Nurse Reuss testified that she was just trying to arrange a ride home for Defendant when she asked him whether he knew anyone's phone number so that she could contact them to pick him up. According to Nurse Reuss, the Defendant replied that he needed to look at his cell phone. Nurse Reuss testified that Defendant informed her that he did not know where his cell phone was located. She then asked Defendant if she could look for his cell phone.

Defendant had his backpack, clothing, shoes and pants near his bed. Nurse Reuss picked up the Defendant's pants and began to look through the front pockets for his cell phone. She testified that she did not know why she did not allow Defendant to search his pants. Upon searching the front left pocket of Defendant's pants, Nurse Reuss located a medium sized, transparent jar containing a white substance. At this point, Nurse Reuss put down the pants and walked out of the Defendant's room and spoke to a police officer from the Bethlehem Police Department, Christopher Pfancook, who, according to Nurse Reuss, was standing about three feet from the nurse's station.

According to Nurse Reuss, Officer Pfancook informed her that the substance in the jar appeared to be a controlled substance and that he instructed her to wash her hands. Nurse Reuss called the Hospital security staff and three to four security officers soon appeared at the nursing station. Nurse Reuss asked Defendant if she could look through the rear pockets of his pants and the remainder of his belongings but Defendant protested.

Nurse Reuss believed that since she had discovered a suspected controlled substance in Defendant's pants, she was "required" by the Hospital to bring Defendant's backpack out to the nurse's station so that security could search it. She testified that no law enforcement officer nor hospital security staff member directed her to search the Defendant's backpack.

She picked up Defendant's backpack and noticed in an outside pocket made of mesh a copper object that she believed was an object used for smoking. She took the object out to the nurse's station where one of the security officers informed her that the object appeared to be a pipe bomb. She then placed the object on the counter at the end of the nursing station.

According to Nurse Reuss, at this point, the emergency room turned into a "hyper state." One of the security officers took the object outside. The emergency room was evacuated from front to back.

Nurse Reuss documented in the Hospital records that at 7:28 a.m., she observed an object in Defendant's backpack. She also made additional entries at 7:40 a.m. and at 9:57 a.m. She did not state in any records that she had never handed Defendant his pants before she searched the pockets. Nurse Reuss testified that the Defendant's cell phone was never found.

Officer Pfancook testified that he has been a police officer with the Bethlehem Police Department since 2020 and before that he was a police officer with the Borough of Hellertown Police Department for six years. On October 15, 2021, he was working the 11:00 p.m. to 7:00 a.m. night shift. He was responsible for guarding a female patient who was in police custody. He testified that Nurse Reuss approached with a transparent jar containing what appeared to be a controlled substance. Officer Pfancook testified that he was seated approximately 8-10 feet from the desk when Nurse Reuss approached with the jar. Based on his training and experience, be believed the substance in the jar was a controlled substance.  He told her to put it down and to wash her hands. He did not perform any tests on the substance.

Officer Pfancook testified that before Nurse Reuss approached with the jar he heard a commotion between Nurse Reuss and the Defendant concerning Nurse Reuss going into Defendant's backpack. Approximately five minutes later, Nurse Reuss came out of Defendant's room with the pipe bomb. Nurse Reuss asked him if he knew what a copper plated object with a fuse sticking out of the center was. He advised her to place the object on the counter and to call security.  When security arrived and attempted to clear the area, Officer Pfancook never left his post in the Hospital. The Hospital, is not located in the City of Bethlehem, but is located in the Borough of Fountain Hill. Officer Pfancook testified that he did not direct Nurse Reuss to search the Defendant's backpack and that he never went into the Defendant's room. Even though the incident occurred on October 15, 2021, Office Pfancook testified that he did not fill out and sign off on a police report of the incident until some three and one-half months later on February 3, 2022.

The parties stipulated that on the morning of October 15, 2021, Detective Richard Krasley of the Fountain Hills Police Department responded to a call for the discovery of narcotics and a pipe bomb at the Hospital's emergency room. Upon arriving, he was informed by hospital security that a suspected destructive device had been recovered from a backpack belonging to a patient in the emergency room. Detective Krasley went into Emergency Room 22 and spoke with Defendant and informed him that what appeared to be a pipe bomb had been found inside Defendant's backpack. Defendant stated to Detective Krasley that he possessed the pipe bomb for self-defense. Detective Krasley informed Defendant that the bomb squad would have to be called to make the device safe. Defendant told Detective Krasley that all he had to do was remove the fuse. Detective Krasley asked Defendant why he was in the hospital. Defendant responded that he was on his way to gamble at the Wind Creek Casino in Bethlehem when he was involved in a car accident.

Special Agent Timothy Shelton of the A.T.F. testified that he is a certified explosives specialist and is stationed in Allentown, Pennsylvania. He testified that on October 15, 2021, he was contacted by the Allentown bomb squad to come to the Hospital. Upon arriving, he observed that the street in front of the Hospital was closed and that the emergency room had been evacuated. Agent Shelton observed an x-ray of the pipe bomb. He then went to Defendant's room where he was joined by Special FBI Agent Jared Witmier. Before speaking with Defendant, Agent Shelton handed Defendant a pre-printed Advice of Rights of Waiver form which included the following "Statement of Rights":

- You have the right to remain silent.
- Anything you say can be used against you in court.

> - You have the right to talk to a lawyer before we ask you any questions and to have a lawyer with you during questioning.
> - If you cannot afford a lawyer, one will be appointed for you if you wish before any questioning begins.
>
> If you decide to answer any questions now without a lawyer present, you have **the right to stop answering at any time**.

Gov't Ex. 3 (emphasis added.) Defendant signed under the "Waiver" portion of the form, which provides:

> I have read this statement of my rights or it has been read to me, and I understand these rights. At this time I am willing to answer questions without a lawyer present. No promises or threats have been made to me, and no pressure or force of any kind has been used against me.

*Id.* Special Agent Witmier also signed the form. *Id.*

Defendant then agreed to talk with Agent Shelton. Defendant informed Agent Shelton that he gathered copper pipe, shotgun shells and explosive powder from his work site, made a fuse and then hammered at both ends of the pipe. He stated that he intended to shoot off the pipe bomb in the woods. Agent Shelton testified that Defendant was alert and cooperative with him at all times and that Defendant admitted ownership of the device.

Defendant testified that he never had a cell phone in his possession at the Hospital as he had broken it the previous Tuesday. He testified that he informed Nurse Reuss that he did not have a cell phone. He testified that he did not grant her permission to search his pants or backpack. He testified that he did not observe Nurse Reuss take a pipe bomb out of his backpack. He testified that he did not place the pipe bomb in his backpack and that he had no idea how it ended up in his backpack.

Defendant's motion to suppress is based entirely on the proposition that it was Officer Pfancook who directed Nurse Reuss to search Defendant's backpack and, therefore, Nurse Reuss was acting as an agent of a government official and needed probable cause before she could conduct a warrantless search of Defendant's backpack on the officer's behalf.

The Fourth Amendment does not apply "to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)(internal quotations marks omitted).

Although our Court of Appeals has not developed a standard for the degree of government activity required in a search to find that an individual was acting as a government agent, several other Courts of Appeals have developed such a test. *United States v. Lucidonio*, 592 F.Supp. 3d 381, 394 (E.D. Pa. 2022)(citing cases). The standard involves consideration of: "(1) whether the government knew of and acquiesced in a private search; and (2) whether the private individual intended to assist law enforcement or had some other independent motivation." *Id.* With regard to the first factor, mere knowledge and passive acquiescence by the Government in the private search is not enough. *United States v. Jarrett,* 338 F. 3d 339, 344 (4th Cir. 2003). Rather, "knowledge and acquiescence ... encompass the requirement that the government must also affirmatively encourage, initiate or instigate the private action." *United States v. Smythe,* 84 F.3d 1240, 1242–43 (10th Cir.1996).

Here, both Nurse Reuss and Officer Pfancook denied that Officer Pfancook affirmatively encouraged, initiated or instigated Nurse Reuss into searching the

7

Defendant's backpack. On the contrary, Nurse Reuss testified that she picked up Defendant's backpack because she had found what appeared to be a controlled substance in one of the pockets of Defendant's pants and therefore was "required" by the Hospital to search the remainder of Defendant's belongings. There clearly is no evidence that Nurse Reuss was intending to aid law enforcement officials. She, therefore, was acting as a private individual in her private capacity and not subject to the strictures of the Fourth Amendment. And, even if she could somehow be considered as acting as an agent of the government, she also testified that she first observed the pipe bomb, not after combing through the backpack's contents, but in plain view as it appeared in the mesh pocket on the outside of the backpack.

Since the Court has found that there was no illegal search in violation of the Fourth Amendment in this case, it follows that the physical evidence and any incriminating statements made pursuant to the legal search will not be suppressed.

In addition, for purposes of *Miranda v. Arizona*, 384 U.S. 426 (1966), the Defendant was not "in custody" when Detective Krasley questioned him. Our Court of Appeals considers five factors in determining whether a person who has not been arrested was in custody:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*United States v. Willaman*, 437 F.3d 354, 359–60 (3d Cir. 2006).

Detective Krasley did not tell Defendant he was under arrest and did no threaten to arrest him. Nor did he tell him that he was free to leave. The location of the

interrogation was not at a police station, in a squad car or in a police-dominated atmosphere but in a hospital emergency room. If Defendant had any doubts about whether he was free to leave, those doubts would have been triggered by the fact that he was being treated for injuries in a hospital's emergency room rather than by any actions of Detective Krasley. At no time was Defendant shackled to his hospital bed. The length of the interrogation was very brief as Detective Krasley was obviously concerned with the public safety. There is no evidence that Detective Krasley used any coercive tactics such as raising his voice or making threats. Finally, there is no evidence that Detective Krasley ordered Defendant to answer any questions. Rather, it was the Defendant who voluntarily submitted to questioning.

Having analyzed the brief exchange between Detective Krasley and the Defendant through the *Willaman* factors, the Court finds that Defendant was not "in custody" for the purposes of *Miranda.*

With regard to the interview conducted by Special Agents Shelton and Witmier, even assuming, *arguendo*, that Defendant was "in custody" during that interview, the record reveals that Defendant clearly waived his *Miranda* rights prior to answering any questions.

A defendant may waive his *Miranda* rights if the waiver is knowingly, intelligently and voluntarily made. *Miranda*, 384 U.S. at 444. The government has the burden of proving, by a preponderance of the evidence, that waivers of *Miranda* rights during an interview were knowing and voluntary. *United States v. Velasquez*, 885 F.2d 1076, 1086 (3d Cir. 1989) (citing *Colorado v. Connelly*, 479 U.S. 157, 168–69 (1986)).

The waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Colorado v.*

9

*Spring,* 479 U.S. 564, 572 (1987) (quotation omitted). The waiver must have been knowing and intelligent in that it "must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* at 573 (quotation omitted).

A signed waiver form is "strong proof" of the validity of Defendant's waiver. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979) ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver but is not inevitably either necessary or sufficient to establish waiver.").

Here, the Waiver was signed by the Defendant before the interview process had begun. The Waiver was not the product of a lengthy interrogation or sleep deprivation. There is no evidence that Defendant suffers from a diminished mental capacity or is not competent. There is no evidence of a lack of comprehension of the waiver of his rights by Defendant. There is no evidence that Defendant signed the Waiver without reading it or paying attention to it. Detective Shelton testified that Defendant was alert and cooperative at all times.

By reading and signing the Waiver which was written in plain, simple language, Defendant admitted that he had read the statement of rights and that he understood those rights. He further admitted that he was willing to answer any questions without a lawyer present and that no promises, threats or pressure of any kind had been used against him. Agent Witmier signed the Waiver as a Witness.

Under the totality of the circumstances adduced at the hearing, the Court finds that Defendant's waiver of his *Miranda* rights before answering questions from Special Agents Shelton and Witmier was knowing and voluntary.

For all the foregoing reasons, the Defendant's motion to suppress is denied.